**FILED**

UNITED STATES DISTRICT COURT

**FEB 2 5 2011**

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

*****************************************************************************

|  |  |  |
|---|---|---|
|  | * |  |
| ROBIN BAIR and FRANCIS ZEPHIER, | * | CIV. 4:09-cv-04009-RAL |
|  | * |  |
| Plaintiffs, | * |  |
|  | * |  |
|  | * | OPINION AND ORDER |
| -vs- | * | DENYING PLAINTIFFS' MOTION FOR |
|  | * | NEW TRIAL |
| ROBERT A. CALLAHAN, M.D., | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

*****************************************************************************

## I. INTRODUCTION

This Court held a jury trial in this case from August 31 to September 3, 2010. The jury

found that the Defendant, orthopedic surgeon Dr. Robert A. Callahan, was not negligent in his

treatment of Plaintiff Robin Bair. The treatment in question included a spinal surgery involving

placement of pedicle screws and rods into Mr. Bair's back. Plaintiffs moved for a new trial

under Rule 59 of the Federal Rules of Civil Procedure, based on two arguments:

> 1. Plaintiffs were prejudiced by the exclusion of certain evidence regarding Dr.
> Callahan's lack of competence and lack of knowledge in performing substantially similar
> pedicle screw surgeries on other patients while practicing at the Yankton Medical Clinic
> in 2007; and
>
> 2. The defense verdict in Dr. Callahan's favor is contrary to the clear weight of the
> evidence and would result in a miscarriage of justice.

(Doc. 87) (internal citations omitted). This Court has conducted a review of the record,

considered all arguments of counsel, and now denies Plaintiffs' motion for the reasons explained

-1-

below.

## II. STANDARD OF REVIEW

Authority to grant a new trial under Rule 59 "is fully within the discretion of the district court." <u>Larson v. Farmers Coop. Elevator of Buffalo Ctr.</u>, 211 F.3d 1089, 1095 (8th Cir. 2000); <u>Lampkins v. Thompson</u>, 337 F.3d 1009, 1013 (8th Cir. 2003) ("[t]he authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court."). The Eighth Circuit "review[s] the district court's decision for a clear abuse of that discretion." <u>Lampkins</u>, 337 F.3d at 1013. "To win reversal, the moving party must show that the trial court's decision to deny the motion and let the verdict stand results in a miscarriage of justice." <u>Id.</u> (quoting <u>Emmenegger v. Bull Moose Tube Co.</u>, 324 F.3d 616, 619 (8th Cir. 2003)); <u>see also</u> <u>Maxfield v. Cintas Corp.</u>, 563 F.3d 691, 694 (8th Cir. 2009) (for a court to order a new trial, movant must establish that a "new trial is necessary to prevent a miscarriage of justice."). "A new trial should be granted only if the evidence weighs heavily against the verdict." <u>Maxfield</u>, 563 F.3d at 694 (citing <u>United States v. Rodriguez</u>, 812 F.2d 414, 417 (8th Cir. 1987)).

The Eighth Circuit has specified various bases for granting a motion for a new trial. A motion for a new trial may be:

> bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.

<u>Children's Broad. Corp. v. Walt Disney Co.</u>, 245 F.3d 1008, 1017 (8th Cir. 2001) (quoting <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S. 243, 251 (1940)). If such a motion is granted, "[t]he district court must articulate its reasons for granting a new trial to permit meaningful

review of the decision." Id. "When reviewing a jury verdict to decide whether it is against the weight of the evidence, a district court conducts its own review of the evidence to determine whether a miscarriage of justice has occurred." Boesing v. Spiess, 540 F.3d 886, 890 (8th Cir. 2008) (quoting Peterson v. Gen. Motors Corp., 904 F.2d 436, 439 (8th Cir. 1990)). As required, this Court has conducted a review of the evidence and record.

## III. FACTS

Plaintiffs Robin Bair and Francis Zephier, husband and wife, filed a Complaint (Doc. 1) against Dr. Robert A. Callahan, alleging medical negligence arising from a failed back surgery on Mr. Bair performed by Dr. Callahan on September 27, 2007, and the failure by Dr. Callahan to subsequently diagnose and remove pedicle screws that were allegedly misplaced during the surgery. (Doc. 1; T. 35). Ms. Zephier brought a loss of consortium claim, alleging injury to her relationship with Mr. Bair as a result of Dr. Callahan's acts and omissions. (Doc. 1). Dr. Callahan practiced as a board certified orthopedic surgeon at the Yankton Medical Clinic during the period in question. (T. 362-65).[1]

## A. Evidentiary Ruling Concerning Dr. Callahan's Treatment of Other Patients

Prior to and during trial, Plaintiffs sought to introduce evidence - through the testimony of Plaintiffs' retained expert Dr. Stanley Gertzbein, the deposition testimony of Dr. Quentin Durward who performed surgery on Mr. Bair and other former patients of Dr. Callahan, and examination of Dr. Callahan himself - of Dr. Callahan's treatment at the Yankton Medical Clinic of Gail Uhing, Jacqueline Nohr, Douglas Haar, and Edward Meng. Each of those four patients brought lawsuits against Dr. Callahan in the United States District Court for the District of South

---

[1]References to the trial transcript will be "T." followed by the page number or numbers.

Dakota. See Uhing v. Callahan, 4:08-cv-04200-KES; Nohr v. Callahan, 4:09-cv-04040-RAL; Haar v. Callahan, 4:08-cv-04123-LLP; Meng v. Callahan, 4:09-cv-04035-RAL. The Meng[2] and Nohr cases currently are pending before this Court, while the Uhing and Haar cases have been settled. All the cases alleged that Dr. Callahan committed medical malpractice during back surgeries by misplacing pedicle screws and failing to remove misplaced screws. The plaintiffs in each case hired the same law firm representing Mr. Bair and Ms. Zephier. Consequently, Mr. Bair and Ms. Zephier's counsel, and in turn their experts, received access to the medical records of Uhing, Nohr, Haar, and Meng. Dr. Callahan moved in limine to exclude such records and all evidence or testimony pertaining to the treatment of Uhing, Nohr, Haar, and Meng. (Doc. 45, at 1-2). Plaintiffs opposed Dr. Callahan's motions in limine, seeking to introduce such evidence under Rule 404(b) or, alternatively, for impeachment purposes under Rule 608, or as habit evidence under Rule 406.

At the pretrial conference and motion hearing held on August 27, 2010, this Court reserved ruling on most of the motions in limine concerning Dr. Callahan's treatment of other patients. (Doc. 66, at 4). This Court also ruled that depositions generated in the other lawsuits brought against Dr. Callahan could be used only for impeachment purposes, rather than to establish that Dr. Callahan had been sued on other occasions. Id.

Following voir dire, this Court told the parties that it likely would exclude any evidence of Dr. Callahan's treatment of other patients. Accordingly, the Plaintiffs did not discuss that evidence during opening statements. At trial, Plaintiffs called Dr. Callahan adversely, Dr.

---

[2]The parties have advised of a settlement of the Meng case, pending bankruptcy court approval.

-4-

Durward by videotaped deposition, and Dr. Gertzbein.  This Court did not permit Plaintiffs to ask

these witnesses any questions concerning Dr. Callahan's treatment of Uhing, Nohr, Haar, or

Meng.

      Dr. Callahan was recalled to the stand during Defendant's case.  Between the end of

Defendant's direct examination and the beginning of Plaintiffs' cross-examination of Dr.

Callahan, Plaintiffs argued that the disputed evidence of Dr. Callahan's past treatment should be

admitted for impeachment purposes because Dr. Callahan testified regarding his experience,

training, knowledge, and expertise, specifically with regard to spinal fusion surgery involving the

placement of pedicle screws.  Dr. Callahan's testimony, however, included only basic

information about his medical education and training,[3] his practice, his board certification, the

advent of the use of pedicle screws and his training on the use of pedicle screws.  Following

argument on the admissibility of the disputed evidence under Rule 608(b), this Court discussed

the application of the Federal Rules of Evidence and issued the following ruling from the bench:

> Here is what the Court is going to allow.  It's consistent with the Kostel[v. Schwartz,
> 2008 S.D. 85, 756 N.W.2d 363] case.  The Court is going to allow the Plaintiffs to ask the
> question, "Did you misplace pedicle screws on other patients while doing surgery at
> Yankton Medical Clinic?"
>
> If he answers that question "yes," that's the end of the testimony on that subject.  If he
> answers the question "no," there's a question about credibility or truthfulness that comes
> up.  So that is the one and only question about credibility or truthfulness that comes up.

---

[3]Dr. Callahan received his undergraduate and medical degrees from Yale University,
followed by a one-year internship in general surgery at Dartmouth Medical School and a three-
year residency in orthopedic surgery at Yale-New Haven Medical Center. (T. 363-65).  After
two years of service in the United States Air Force at Offutt Air Force Base in Nebraska (T. 363),
Dr. Callahan worked in academic medicine for approximately four years in Florida. (T. 363).
He then entered private practice, practicing in Tampa, Florida from 1978 to 2006, and at the
Yankton Medical Clinic in Yankton, South Dakota, from 2006 to 2007. (T. 363-64).

(T. 404). Plaintiffs' counsel then asked that single question on cross-examination, to which Dr. Callahan responded, "Yes." (T. 405).

Outside the hearing of the jury, Plaintiffs made an offer of proof of additional testimony by Dr. Gertzbein and a portion of Dr. Durward's videotaped testimony that was not played before the jury. That portion of Dr. Durward's deposition transcript included his opinions concerning Dr. Callahan's medical treatment of Haar and Uhing, whom Dr. Durward also treated with corrective surgery following their surgeries with Dr. Callahan. In this portion of the videotape, Dr. Durward testified that Dr. Callahan had misplaced pedicle screws and failed to correct such misplacements while performing back surgeries on Haar and Uhing. (Doc. 58). Plaintiffs also called Dr. Gertzbein to make an offer of proof regarding his expert opinions concerning other fusion surgery patients treated by Dr. Callahan. Dr. Gertzbein explained that, based on his review of the medical records of Robin Bair, Edward Meng, Jackie Nohr, and Doug Haar, Dr. Callahan misplaced multiple pedicle screws and failed to identify and correct misplaced screws in all of their surgeries, for a total of 13 misplaced pedicle screws out of 22 pedicle screws[4] placed in those patients. (T. 508).

## B. Evidence Presented at Trial

The back surgery performed by Dr. Callahan on Mr. Bair was to be a bilateral lumbar fusion. (T. 66-67). For this surgery, Dr. Callahan planned to insert four pedicle screws into Mr. Bair's back: 1) on the right side of the L5 vertebrae; 2) on the left side of the L5 vertebrae; 3) on

---

[4]With the jury having found that the pedicle screws inserted by Dr. Callahan in Mr. Bair's back were not misplaced, this analysis perhaps should be viewed as 9 or 10 of 22 pedicle screws in these patients allegedly being misplaced.

-6-

the right side of the S1 vertebrae; and 4) on the left side of the S1 vertebrae.[5] The case turns on

whether Dr. Callahan misplaced any of the pedicle screws and failed to detect and correct any

misplacement.

Dr. Callahan initially placed a pedicle screw on the right side of the L5 level, did not feel

as if it had sufficient bone purchase, removed that screw, and instead placed a screw on the right

side at the L4 level. (T. 69-72). Dr. Callahan testified that when surgery began, he fully

intended to fuse the L4 level, but he did not know whether a pedicle screw insertion would be

necessary. (T. 71). Because of Mr. Bair's size, Dr. Callahan thought a possibility existed that a

screw at the L4 level would have been necessary. (T. 71). The Consent Form for the surgery

indicated that it would be L4 to S1. (T. 141). Dr. Gertzbein acknowledged that the pedicle

screw on the right at the L4 level was placed within the pedicle. (T. 188). Dr. Gertzbein,

however, criticized Dr. Callahan's failure to place the screw properly within the L5 pedicle.

Dr. Callahan testified that the screw positioned at L5 on the left side was "well

positioned in the pedicle, with solid bone fixation all around," "with good purchase of the bone,

giving what would be good stability." (T. 80-81). Plaintiffs' expert, Dr. Gertzbein, initially

opined based on an x-ray[6] that the L5 screw was outside the pedicle. On cross-examination,

---

[5]The vertebrae in the lumbar spine, of course, starting from the top, are designated as L1, L2, L3, L4, and L5. The vertebrae in the sacrum, starting at the top, are designated as S1, S2, S3, S4, and S5. The upper part of the sacrum connects with the lumbar vertebrae. L5 is the lumbar vertebrae nearest the sacrum, with S1 being nearest to L5.

[6]The x-ray image appeared to show the L5 screw on the left side being outside the pedicle. All experts agreed that a CT myelogram produces superior images to an x-ray for purposes of determining placement of pedicle screws. The radiologist's report of the CT scan suggested that Dr. Callahan may have misplaced some of the pedicle screws in Mr. Bair's back. However, the radiologist was not called to testify, and the experts called disagreed on how to interpret the CT scan images.

when presented with an image from the June of 2008 CT myelogram with intrathecal contrast,
Dr. Gertzbein admitted that the left L5 screw was within bone. (T. 193-94). Later, however,
based on a different image from the CT myelogram, Dr. Gertzbein returned to the opinion that
the left L5 screw was misplaced and that reactive bone had formed around the screw after
placement. (T. 487-90). Dr. Durward testified that the screw could have been lateral to, or
outside of, the L5 pedicle. (T. 33-34). Dr. Durward removed this screw during his corrective
lumbar fusion surgery on Mr. Bair. Dr. Joseph Cusick, an expert witness for Defendant,
testified that the left L5 pedicle screw was entirely within bone, as demonstrated by the axial
view of the screw from the CT myelogram. (T. 451-52).

Plaintiffs' witnesses testified that both screws at the S1 level were misplaced and that S1
and S2 nerve root irritation resulted. (T. 34, Dr. Durward); (T. 153-60, Dr. Gertzbein). Dr.
Cusick testified that neither of the sacral screws caused any damage to the S1 nerve root. (T.
455-57). Dr. Cusick noted that Mr. Bair did not exhibit symptoms of damage to his S2 nerve
root, (T. 457-58), such as bowel and bladder control problems. (T. 457-58).

Dr. Callahan testified that following surgery, x-rays demonstrated "good position of [Mr.
Bair's] internal fixation and bone graft." (T. 392). Dr. Callahan maintained, consistent with
Mr. Bair's medical records, that Mr. Bair did not report pain different from what would be
expected from someone recovering from such a surgery. Dr. Callahan testified that none of the
screws were in contact with a nerve root, and that if screws were abutting a nerve root, then Mr.
Bair would have exhibited the symptoms of screaming and unrelenting pain, which he did not.
(T. 87-90). Dr. Callahan attributed Mr. Bair's pain to scar tissue that developed post-
operatively, which may cause radicular pain after surgery. (T. 93, 97). Mr. Bair, however,

-8-

testified to experiencing extreme pain after the surgery and until Dr. Durward's corrective surgery.

Dr. Callahan testified that he advised Mr. Bair of the risks associated with lumbar fusion surgery, specifically "nerve injury, failure of the hardware to work, failure of the fusion to take, and the need for subsequent surgery or treatment." (T. 375-76). After receiving this advice, Mr. Bair signed a Consent Form to proceed with the surgery. (T. 375-76). Dr. Cusick supported how Dr. Callahan had advised Mr. Bair concerning surgical intervention. (T. 444).

From an x-ray taken during one of Mr. Bair's follow-up visits, Dr. Callahan discovered that a rod had become detached from one of the pedicle screws, which is a risk of the surgery. Dr. Callahan testified that the rod could have detached due to Mr. Bair's size or causes other than medical malpractice. (T. 85-86). Dr. Cusick agreed that the rod failure was an instrumentation failure and not reflective of a deviation from the standard of care. (T. 447). Plaintiffs focused their claim of malpractice on Dr. Callahan's positioning of pedicle screws and failure to detect mispositioned screws, rather than on the disconnected rod. Because of the detached rod, Dr. Callahan discussed doing a second surgery with Mr. Bair. Mr. Bair ultimately underwent a second surgery performed by Dr. Durward, during which Dr. Durward removed all of the hardware and screws placed by Dr. Callahan and placed new pedicle screws and rods.

Mr. Bair's back did not fuse after either surgery, and thus the surgeries failed to achieve their intended result. However, expert testimony established that a nonunion is not necessarily malpractice or reflective of a breach of the standard of care, due to the inherent risks of the procedure. (T. 199, Dr. Gertzbein); (T. 460-61, Dr. Cusick).

Defendant also presented evidence that Mr. Bair's symptoms dated back to 1998. (T.

-9-

178). Defendant suspected that the failed fusion resulted from a variety of factors including Mr.
Bair's body weight, the manner in which he carries his weight, his underlying diabetes, and
possible genetic or metabolic problems. Dr. Gertzbein concurred that an individual's weight
and diabetes may reduce fusion rates to some degree. (T. 144). Dr. Cusick also testified that
Mr. Bair's size and diabetes affected Mr. Bair's lower back condition. (T. 434-436). Mr. Bair
presented evidence that misplaced pedicle screws may contribute to the failure of the fusing of
the L5 and S1 vertebrae.

In sum, through the testimony of Dr. Gertzbein, Dr. Durward, and Mr. Bair, Plaintiffs
presented a case that Dr. Callahan was negligent. Dr. Callahan, however, disputed Plaintiffs'
claims and presented competing evidence, including testimony from an expert witness, Dr.
Cusick, opining that Dr. Callahan was not negligent.

## IV. DISCUSSION

### A. Exclusion of Plaintiffs' Other Acts Evidence

### 1. Rule 404(b) Application

Plaintiffs contend that they were denied a fair trial by exclusion of evidence of Dr.
Callahan's surgeries on Uhing, Haar, Meng, and Nohr. According to Plaintiffs, such evidence
was relevant to show that Dr. Callahan did not have the requisite knowledge and skill to
perform pedicle screw surgery on Mr. Bair's spine. As a result, Plaintiffs argue that such
evidence should have been admitted under Rule 404(b).[7]

Rule 404(b) states:

---

[7]Because Plaintiffs' Motion for a New Trial and supporting memoranda do not argue that
a new trial should be granted due to the exclusion under Rules 608 and 406 of the same evidence
at issue, this Court does not address those rulings in this opinion and order.

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a
> person in order to show action in conformity therewith.  It may, however, be admissible
> for other purposes, such as proof of motive, opportunity, intent, preparation, plan,
> knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b).  Thus, evidence of prior bad acts, though not admissible to show that a

person acted in conformity therewith, is admissible if probative of some other purpose, such as

knowledge.  Fed. R. Evid. 404(b).

The Eighth Circuit has articulated a four-part test for admissibility under Rule 404(b):

"The evidence must be 1) relevant to a material issue; 2) similar in kind and not overly remote

in time to the charged crime; 3) supported by sufficient evidence; and 4) such that its potential

prejudice does not substantially outweigh its probative value." Am. Family Mut. Ins. Co. v.

Miell, 569 F. Supp. 2d 841, 848 (N.D. Iowa 2008) (citing United States v. Williams, 308 F.3d

833, 837 (8th Cir. 2002)); see also United States v. Shillingstad, No. 10-1283, slip. op. at 4 (8th

Cir. Feb. 22, 2011); United States v. Turner, 104 F.3d 217, 222 (8th Cir. 1997); United States v.

Aranda, 963 F.2d 211, 215 (8th Cir. 1992).  Plaintiffs contend that the Court erred by not

expressly weighing each of the four parts when explaining its decision to exclude all evidence of

prior failed surgeries (except for the one question to Dr. Callahan concerning whether he had

ever previously misplaced pedicle screws while doing surgery at Yankton Medical Clinic).

Plaintiffs argue that evidence of Dr. Callahan's inability to correctly perform other pedicle screw

back surgeries while practicing at Yankton Medical Clinic is relevant to establish his lack of

knowledge and competence to safely perform such surgeries and, therefore, satisfies the Eighth

Circuit requirements for admission under Rule 404(b).  See In re Yemmanur, 447 N.W.2d 525,

528 n.3 (S.D. 1989) ("In performing professional services for a patient, a physician has the duty

to have that degree of learning and skill ordinarily possessed by physicians of good standing engaged in the same type of practice in the same or similar locality.") (internal citations omitted).

This Court did not expressly consider on the record the four-part test, nor did counsel urge the Court to separately consider each factor on the record. This Court, however, did expressly consider the language of Rule 404(b) when deciding to limit Plaintiffs to a single question about Dr. Callahan's treatment of other patients. Considering the four factors expressly now, this Court finds that the treatment of other patients represented by the same law firm as Plaintiffs was "similar in kind and not overly remote in time to the [alleged wrongdoing]." Whether there was "sufficient evidence" to support a jury finding that Defendant committed the other acts of malpractice is debatable between Plaintiffs and Defendant; none of the cases have involved admitted liability or resulted in a plaintiff's verdict. However, this Court's chief reasons for limiting Plaintiffs to a single question concerning the other acts evidence were that such evidence was only tangentially relevant to "knowledge," and that the probative value of such evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and considerations of undue delay.

Plaintiffs assert that the other instances of alleged malpractice go to Defendant's "knowledge." Rule 404(b) does not provide an exhaustive list of purposes for which other acts may be admissible, but of the examples in Rule 404(b), Plaintiffs point only to "knowledge." Here, the other acts evidence proferred by the Plaintiffs arguably might be relevant to suggest a possible *lack of* "knowledge," but the evidence here does not fit with cases allowing such evidence as relevant to "knowledge." See 22 Charles Alan Wright & Arthur R. Miller, Federal

-12-

Practice & Procedure, § 5245 (1978 & Supp. 2010). In reality, Dr. Callahan had the knowledge to perform the surgery;[8] the real question was whether Dr. Callahan applied his knowledge competently in placing pedicle screws in Mr. Bair's back and determining whether the screws were properly placed. If, as Plaintiffs' other acts evidence sought to prove, Dr. Callahan had misplaced some pedicle screws in other patients while properly placing other pedicle screws in those same patients, such information would demonstrate "knowledge" of how to do the surgery, but a lack of competence or care in the performance of the surgery. Plaintiffs' desire to introduce such other acts evidence ran more to showing lack of competence or care - that is, malpractice - with respect to other patients. From such evidence, the jury then could infer that Dr. Callahan had a propensity to commit malpractice by misplacing pedicle screws and thus may or perhaps must have committed similar malpractice in the surgery to Mr. Bair. However, Rule 404(b) bars the use of evidence of other alleged wrongs to show, circumstantially, action in conformity therewith. Thus, the legitimate probative value of the proferred other acts evidence to show "knowledge" or lack of "knowledge" was limited.

The potential of the proffered other acts evidence for unfair prejudice, confusion of the issues, misleading the jury, and considerations of undue delay substantially outweighed the probative value of the proferred evidence. Had the evidence been admitted, there would have been mini-trials about Dr. Callahan's prior surgeries on Haar, Uhing, Nohr, and Meng. Despite these cases being defended by the same law firm, Dr. Callahan's counsel stated that they were

_____

[8]As detailed in footnote 3, Dr. Callahan had the requisite training, experience, and board certification as an orthopedic surgeon (T. 362-65). He also had training and experience in the use of pedicle screws in spinal fusion surgery. (T. 365-66).

-13-

not prepared for such mini-trials.[9] Such mini-trials would risk distracting the jury with

competing evidence on allegations by other patients against Dr. Callahan. In addition,

admission of the other acts evidence could have opened the door to Dr. Callahan to present

evidence of successful lumbar fusion surgeries involving pedicle screws performed by him and

possibly to present his own calculation of how many pedicle screws he had properly placed in

the past. Thus, the danger of unfair prejudice, confusion of issues, misleading the jury, and

potential undue delay substantially outweighed the limited legitimate probative value of the

other acts evidence.

　　　Several courts have excluded evidence similar to that which Plaintiffs sought to

introduce. See Lai v. Sagle, 818 A.2d 237, 247 (Md. 2003) (noting that "[t]he fact of prior

litigation has little, if any, relevance to whether [defendant] violated the applicable standard of

care in the immediate case."); Laughridge v. Moss, 294 S.E.2d 672, 674 (Ga. App. 1982)

(holding that the trial court did not err in disallowing evidence of alleged previous act of

medical malpractice against defendant, noting that "[t]he general rule in a suit for negligence is

that evidence of similar acts or omissions on other and different occasions is not admissible.");

Cerniglia v. French, 816 So. 2d 319, 322-25 (La. App. 2002) (holding that evidence of prior

similar acts was not proof of medical malpractice or whether the doctor lacked the proper degree

of knowledge or skill); Persichini v. William Beaumont Hosp., 607 N.W.2d 100, 105-06 (Mich.

---

[9]On August 17, 2010, Defendant filed his motions in limine concerning Dr. Callahan's treatment of other patients. (Doc. 45). On August 23, 2010, Plaintiffs took the deposition of Dr. Durward. (Doc. 58). This case was the first of these malpractice cases against Dr. Callahan to be tried. Defendant probably could have presented some evidence refuting the claims of malpractice on Haar, Uhing, Nohr, and Meng, but stated that the defense was not prepared to rebut those charges at the trial. (T. 403-04).

App. 1999) (holding that mistrial was warranted for trial court allowing questions concerning

prior malpractice lawsuits against witness, because "evidence of prior malpractice actions

against a witness is not relevant to the witness' competency or knowledge."); Jones v. Tranisi,

326 N.W.2d 190, 192 (Neb. 1982) (holding that evidence of prior similar act was not relevant

for the purpose of proving doctor's negligence in performing operation at issue on particular

occasion).  Authority also exists to support the exclusion of evidence of a doctor's success or

failure rates. Wlosinski v. Cohn, 713 N.W.2d 16, 21-22 (Mich App. 2005) ("[B]are numerical

success rates are not, in themselves, evidence that a doctor did anything wrong.").

     Plaintiffs contend that one comment by the Court suggested misinterpretation of Rule

404(b)'s status as a rule of inclusion. See United States v. Jones, 990 F.2d 1047, 1050 (8th Cir.

1993) ("Rule 404(b) is considered a rule of inclusion, precluding only evidence that is relevant

solely to the defendant's character.") (internal quotation omitted); United States v. Sykes, 977

F.2d 1242, 1246 (8th Cir. 1991) ("this court views Rule 404(b) as a rule of inclusion").  At trial,

the Court stated, "generally this is not admissible evidence."[10]  (T. 402.).  This Court is well

aware that Rule 404(b) is considered a rule of inclusion. As the trial transcript shows, the

Court's statement was made in the context of weighing whether the probative value of the

evidence was substantially outweighed by the danger of unfair prejudice, confusion of the

issues, misleading the jury, or considerations of undue delay:

> [G]enerally this is not admissible evidence.  Otherwise you are having mini trials.  You
> are having the doctor testifying to multiple occasions where he's had good results.  You
> wind up getting way off track in what the issue is for trial.

---

[10]The cases cited in the paragraph preceding this one reflect that such other acts evidence
of alleged malpractice generally is not admissible.

(T. 402). Thus, the Court made the statement while discussing why the evidence would be inadmissible under part four of the four-part showing for admissibility under Rule 404(b), as well as under Rule 403.

Plaintiffs argue that the risk of minitrials would have been minimal. In support, Plaintiffs noted that this evidence was admitted under Rule 404(b) in the Haar case,[11] and that Plaintiffs' law firm was able to present this evidence in approximately one hour. However, admission of such evidence in this case would have opened the door for Dr. Callahan to present evidence refuting the claims of other acts of malpractice, potentially to present evidence regarding satisfied past patients, and to discuss his other successful fusion surgeries involving pedicle screws. As discussed above, Rules 403 and 404(a) of the Federal Rules of Evidence and first and fourth prongs of the Eighth Circuit's test for admission of evidence under Rule 404(b) guide this Court not to allow such other acts evidence.

Plaintiffs finally argue that exclusion of the proffered evidence was prejudicial to Plaintiffs, such that admission upon retrial "would be likely to produce a different result." See Moses.com v. Comprehensive Software Sys., Inc., 406 F.3d 1052, 1058-59 (8th Cir. 2005) (when considering a motion for new trial, "[a] trial court must determine whether an evidentiary ruling was so prejudicial as to require a new trial which would be likely to produce a different result."). Plaintiffs argue that the excluded evidence was critically important as a central piece of the case, and that Dr. Callahan left a false impression that his inability to safely perform the back surgery on Robin Bair either was an aberration or attributable to various physical

_____

[11]The Hon. Karen E. Schreier, Chief United States District Judge for the District of South Dakota, began a jury trial of the Haar case, but it was settled prior to being submitted to the jury.

characteristics of the patient himself.  If the evidence were to be admitted at a new trial,

according to Plaintiffs, a jury would conclude that the failed surgery was not an isolated

aberration, but rather the direct result of Dr. Callahan's documented lack of knowledge and

inability to safely perform this type of surgery during his eight-month tenure at Yankton

Medical Clinic.  Plaintiffs overlook that Dr. Callahan admitted that he had failed to properly

place pedicle screws in other surgeries and that Plaintiffs' counsel then used that concession in

closing argument to suggest that Dr. Callahan was negligent.  (T. 543).  Plaintiffs also overlook

that the admission of additional evidence of misplaced pedicle screws would have allowed for

Dr. Callahan to testify about his history of successful surgeries and potentially to call satisfied

patients and others to testify about his care and performance of surgeries on other patients.

Thus, when considering all the evidence, this Court cannot conclude that the other acts evidence

would have likely produced a different jury verdict.

## 2. Limitation of Questioning about Other Acts Evidence

At trial, Plaintiffs relied heavily on the case of Kostel v. Schwartz, 2008 S.D. 85, 756

N.W.2d 363, to support admission of the other acts evidence.  The ruling of this Court to limit

Plaintiffs' questioning of Dr. Callahan about other acts evidence was consistent with Kostel.

In Kostel, the Supreme Court of South Dakota confronted a similar circumstance.

Plaintiff Kostel brought a medical malpractice claim against defendant Dr. Schwartz, a

neurosurgeon, related to a spinal surgery.  2008 S.D. 85, ¶¶ 1-2, 756 N.W.2d at 367.  At trial,

the jury found in favor of Kostel and awarded damages of $556,962.96.  Id. at ¶¶ 6-7, 756

N.W.2d at 368-69.  Both parties appealed and alleged error as a result of various evidentiary

rulings.  On appeal, one issue concerned whether the trial court abused its discretion when

-17-

allowing Kostel to elicit testimony from Schwartz pertaining to alleged other acts.  Id. at ¶ 7,

756 N.W.2d at 369.  The other acts involved "evidence pertaining to the two mistakenly

performed spinal surgeries conducted by Dr. Schwartz within time proximity with Kostel's."  Id.

at ¶ 29, 756 N.W.2d at 376.  Kostel's counsel argued that the evidence was relevant to the case

and that it should be admitted to show "the degree of knowledge and skill possessed by Dr.

Schwartz."  Id.  Although the trial court found that the probative value of the proffered evidence

was not substantially outweighed by the danger of unfair prejudice, it ultimately limited the

evidence by allowing Kostel only to ask Schwartz the following three questions "for the purpose

of determining whether Dr. Schwartz had the requisite skill and knowledge required of a

neurosurgeon to read and interpret the radiographic images in this case:

> 1. Did you misread X-rays involving spinal surgeries in the 14 months prior to Ms.
> Kostel's surgery?
> 2. On how many occasions did you misread X-rays involving spinal surgeries during
> this period of time?
> 3. Did you operate at a level of a patient's spine not consented to in the 14 months prior
> to Ms. Kostel's surgery?

Id. at ¶ 26, 756 N.W.2d at 374-75.  The Supreme Court of South Dakota found that the trial

court did not abuse its discretion when permitting Kostel to ask the three questions and admitted

Dr. Schwartz's answers under South Dakota Rule of Evidence 404(b), which is substantially

similar to Rule 404(b) of the Federal Rules of Evidence.  Id. at ¶ 31, 756 N.W.2d at 376;

compare Fed. R. Evid. 404(b) with S.D.C.L. § 19-12-15.  In reaching this decision, the Court

noted that, "[f]rom Dr. Schwartz's affirmative answers to the three questions, there was

sufficient evidence to reasonably conclude that the jury could find that he had made prior

mistakes."  Id. at ¶ 31, 756 N.W.2d at 376.

Another issue on appeal in <u>Kostel</u> concerned whether the trial court abused its discretion when precluding Dr. Schwartz from testifying to his training, experience, and knowledge without opening the door to the disclosure of other allegations of malpractice and associated disciplinary proceedings. <u>Id.</u> at ¶ 8, 756 N.W.2d at 369. Dr. Schwartz moved in limine to exclude evidence or testimony concerning other pending malpractice suits and South Dakota State Board of Medical and Osteopathic Examiners proceedings against him. <u>Id.</u> at ¶¶ 10-11, 756 N.W.2d at 369-70. The trial court granted the motion, but conditioned the exclusion of evidence "on Dr. Schwartz refraining from offering any testimony about his training and experience, or opinions as to the applicable standard of care." <u>Id.</u> Dr. Schwartz was permitted to testify about the surgery he performed on Kostel. <u>Id.</u> On appeal, Dr. Schwartz argued that an inquiry into other pending malpractice cases or board proceedings would violate South Dakota's version of Rule 608(b). <u>Id.</u> at ¶ 13, 756 N.W.2d at 370. Recognizing that "where a witness makes an issue of his credibility by favorable direct testimony, he opens the door to impeachment evidence on cross-examination," <u>Id.</u> at ¶ 20, 756 N.W.2d at 373 (citation omitted), the Court found "no prejudice in the trial court's conditional exclusion of evidence related to the other pending malpractice actions and Board proceedings." <u>Id.</u> at ¶¶ 20-22, 756 N.W.2d at 373-74. In reaching its decision, the Court noted that Dr. Schwartz's position was inappropriate because, "had Dr. Schwartz testified as he proposed, Kostel's inquiry on cross-examination would have been based, not on allegations, but rather on Dr. Schwartz's own admissions of malpractice" in deposition testimony, which "would have related to Dr. Schwartz's competency, and thereby would have been relevant to the assessment of his credibility in the eyes of the jury." <u>Id.</u> at ¶ 22, 756 N.W.2d at 374.

In the case at bar, this Court's rulings were consistent with <u>Kostel</u>. The proffered other acts evidence consisted of allegedly misplaced pedicle screws in spinal surgeries conducted by Dr. Callahan in surgeries performed close in time to Mr. Bair's surgery. By allowing Plaintiffs to ask Dr. Callahan whether he had misplaced pedicle screws on other patients while doing surgery at Yankton Medical Clinic, along with Dr. Callahan's affirmative answer, there was sufficient evidence for the jury to infer that Dr. Callahan had made prior mistakes.

This Court's ruling that Dr. Callahan's testimony did not open the door to detailed cross-examination concerning the other acts evidence also is supported by <u>Kostel</u>. Unlike Dr. Schwartz in the <u>Kostel</u> case, Dr. Callahan had not admitted to any malpractice previously. Instead, Dr. Callahan consistently has maintained that he has not committed malpractice. Dr. Callahan testified only to basic information about his medical education and training, his practice, his board certification, the advent of the use of pedicle screws, and his training on the use of pedicle screws. Dr. Callahan's testimony did not open the door to detailed cross-examination concerning allegations of prior malpractice under Rule 404(b) or 608(b).

**B. Whether the Verdict was Contrary to the Clear Weight of the Evidence**

As a separate basis for a new trial, Plaintiffs argue that the jury's verdict was contrary to the clear weight of the evidence. The Eighth Circuit has held that "[t]he district court may order a new trial if convinced the verdict goes against the clear weight of the evidence or where a miscarriage of justice will result." <u>Schooley v. Orkin Extermination Co., Inc.</u>, 502 F.3d 759, 768 (8th Cir. 2007); <u>see</u> also <u>Simco v. Ellis</u>, 303 F.3d 929, 932-33 (8th Cir. 2002) (affirming trial court's granting of a motion for a new trial because "[i]t was a miscarriage of justice for the jury to conclude that the defendants were not at fault in causing the fatal crash or that the

accident was unavoidable."). "When reviewing a jury verdict to decide whether it is against the weight of the evidence, the district court conducts its own review of the evidence to determine whether a miscarriage of justice has occurred. However, the trial judge may not usurp the functions of the jury, which weighs the evidence and credibility of witnesses." Boesing, 540 F.3d at 890. In Simco, the Eighth Circuit affirmed the district court's granting of a motion for a new trial because defendant truck driver's negligence "was readily apparent from the uncontroverted evidence at trial," and the district court "did not abuse its discretion in deciding that a new trial was required to avoid a miscarriage of justice." 330 F.3d at 933.

Under Plaintiffs' view of the evidence, the jury should have found that Dr. Callahan misplaced three out of four pedicle screws in Mr. Bair's spine during the surgery. If the jury had chosen not to credit the testimony of Dr. Callahan and Dr. Cusick, there certainly was ample evidence to support a Plaintiffs' verdict. However, if the jury credited the testimony of Dr. Callahan and Dr. Cusick and the evidence presented by Dr. Callahan, then the jury reasonably could have found that the evidence and testimony at trial did not establish Dr. Callahan's negligence by the greater convincing force of the evidence. Ultimately, the jury determined that the expert testimony at trial did not establish negligence on the part of Dr. Callahan by the greater convincing force of the evidence. See Boesing, 540 F.3d at 890 (8th Cir. 2008) (holding that district court did not abuse discretion in denying motion for new trial because non-movant "presented sufficient evidence at trial for the district court to conclude that the outcome was not against the great weight of the evidence so as to constitute a miscarriage of justice."). Even if this Court would have made different credibility determinations or weighed the evidence differently, this Court cannot usurp the jury's role of weighing the credibility of evidence and

-21-

witnesses, absent there being a miscarriage of justice or a verdict against the clear weight of the evidence. <u>See</u> <u>Boesing</u>, 540 F.3d at 890. Here, there is enough uncertainty in the dueling expert testimony and differing interpretations of CT myelogram images of the screw placements that the Court cannot conclude that the clear weight of the evidence favored a Plaintiffs' verdict or that a miscarriage of justice resulted.

**V. CONCLUSION**

For the foregoing reasons, it is hereby

ORDERED that Plaintiffs' motion for a new trial (Doc. 87) is denied.

Dated this **25ᵗʰ** of February, 2011.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE